FEDERAL LAND BANK OF BALTIMORE, peticionaria, *v.* LA CORTE DE DISTRITO DE AGUADILLA, HON. ENRIQUE S. MESTRE, JUEZ, demandada.

No. 891.—*Sometido:* Abril 6, 1933. *Resuelto:* Junio 5, 1933.

Arturo Reichard, Frank Martínez, S. García Díaz y E. Campos del Toro, abogados de la peticionaria; Harry Besosa, Fiscal Federal, por los Estados Unidos; J. Fernández Diez, por la Junta de Suplentes de la "Puerto Rico Hurricane Relief Commission."

EL JUEZ ASOCIADO SEÑOR CÓRDOVA DÁVILA, emitió la opinión del tribunal.

The Federal Land Bank of Baltimore inició un procedimiento de ejecución de hipoteca contra Julio Acevedo Bosques y su esposa Josefa Vera, para hacer efectivo un crédito de $1,000 con sus intereses al 5½ por ciento anual. Para garantía de este préstamo los esposos Acevedo Vera hipotecaron una finca de su propiedad que más tarde fué gravada con una segunda hipoteca a favor de los Estados Unidos de América. El acreedor hipotecario incluyó a los Estados Unidos como demandado en el procedimiento y notificó al "Attorney General" de los Estados Unidos y al Fiscal Federal de Puerto Rico (United States District Attorney), quien compareció ante la corte inferior alegando que la misma carecía de jurisdicción y competencia en cuanto a los Estados Unidos y al crédito de que era dueño.

La corte inferior declaró nulo el procedimiento seguido en cuanto a Estados Unidos alegando que ni la Ley Hipotecaria ni su reglamento autorizan que se haga parte demandada en un procedimiento para el cobro de un crédito hipotecario a las personas interesadas en las responsabilidades que se hubieren inscrito después del derecho del actor y que además la ley titulada "An Act to permit the United States to be made a party defendant in certain cases" no es de aplicación al presente caso. La corte inferior suspende toda acción tomada en relación con el crédito del peticionario y declara que cesa en el ejercicio de su jurisdicción y competencia en cuanto a dicho peticionario y su crédito. En vista de esta resolución The Federal Land Bank solicitó de esta corte la expedición de un auto de *certiorari* para revisar los procedimientos de la corte inferior.

■■ La cuestión fundamental a resolver es si esta ley para permitir a Estados Unidos ser designado como parte demandada en ciertos casos rige en Puerto Rico con la misma amplitud y alcance que en los Estados del Continente. De acuerdo con nuestra Ley Hipotecaria, cuando existen responsabilidades inscritas con posterioridad al derecho del acreedor ejecutante, se notificará el auto de requerimiento de pago a las personas interesadas en dichas responsabilidades. Esta notificación a los acreedores que inscribieron con posterioridad al ejecutante ofrece a los mismos la oportunidad de satisfacer el crédito, intereses y costas, antes del remate, y de intervenir en el avalúo y subasta de los bienes si así lo desean. Hecha esta notificación sigue su curso el procedimiento de apremio, sin hacerse otra alguna a los acreedores. 4 Morell, 58; 3 Barrachina, 163. No requiere la Ley Hipotecaria que se incluya como demandados a los acreedores posteriores. Basta cumplir con el requisito de la notificación.

En Estados Unidos continentales el acreedor posterior no es generalmente una parte necesaria para que la corte pueda dictar una sentencia obligatoria y definitiva en cuanto

a las partes que intervinieron en el procedimiento; pero si este segundo acreedor no ha sido incluído como parte demandada, la sentencia dictada no le afecta ni impide que en el futuro ejercite cualquier derecho de redención que pueda tener. Este derecho de redención tiene su origen en las cortes de equidad. Surgió de la necesidad, para atenuar la severidad del derecho común, que permitía que el título de la propiedad pasase del deudor al acreedor hipotecario y que se consolidase en éste el dominio absoluto y definitivo cuando el primero faltase a las condiciones estipuladas en el contrato. Para extinguir este derecho de redención, conocido con el nombre de "equity of redemption", es que el acreedor hipotecario acude al procedimiento de "foreclosure" contra el deudor hipotecario y cualquier otra parte con derecho a redimir. Para suavizar los rígidos preceptos del derecho común, acudieron las cortes inglesas al derecho romano, en cuyas fuentes bebieron los principios de equidad que ampararon los derechos del deudor hipotecario. Reconociendo esta contribución del derecho civil, dice la Corte Suprema de Illinois en el caso de *Longwith* v. *Butler,* 8 Ill. 37:

"La equidad, sin embargo, ha obtenido jurisdicción sobre el objeto de la hipoteca, y, con un espíritu de humanidad y justicia, ha modificado esencialmente los principios de derecho común, y como han dicho algunos eminentes escritores, ha conseguido un noble triunfo sobre los tecnicismos. 4 Kent, 158; 2 Story, sec. 1014. Todos los que tengan algún conocimiento del derecho romano convendrán en que las doctrinas equitativas que ahora prevalecen universalmente con respecto a hipotecas, han sido derivadas de aquella fuente. El derecho civil, en éste como en muchos otros casos, ha sido el gran arsenal donde las cortes de equidad en Inglaterra se han equipado con las armas más eficientes para liberarse de las severidades del inflexible y riguroso derecho común.

"*     *     *     *     *     *     *

"La falta de pago en la fecha estipulada no implicaba en el derecho civil la pérdida de la cosa hipotecada o pignorada; pero el acreedor obtenía el derecho de reembolsarse, vendiendo, y ordinariamente podía vender sin ninguna sanción judicial, después de notificar al deudor de su intención, tuviera o no autoridad expresa para la

venta. 2 Story's Eq., sec. 1009, y numerosas autoridades allí citadas. En realidad, se acudía generalmente a las cortes en tales casos, cuando la venta de la propiedad, real o personal, no podía efectuarse, con el propósito de obtener un decreto, invistiendo al acreedor hipotecario con el dominio absoluto de dicha propiedad. 2 Story's Eq., sec. 1024.''

Entre nosotros tanto el deudor hipotecario como los acreedores posteriores tienen oportunidad de satisfacer la cantidad reclamada hasta momentos antes de efectuarse el remate de los bienes hipotecados. Existen prácticamente para el deudor y acreedores posteriores las mismas garantías reconocidas por los principios de equidad. En el presente caso Estados Unidos es un segundo acreedor hipotecario. El Banco Federal utiliza para cobrar su crédito el procedimiento sumario. Requerido de pago el deudor y notificados los subsiguientes acreedores, la corte adquiere jurisdicción para cancelar los gravámenes posteriores, sin necesidad de ulteriores procedimientos, una vez efectuada la venta judicial. Ésta ha sido la práctica invariablemente seguida desde la implantación del sistema hipotecario. En este caso, sin embargo, se pide que se incluya como parte demandada a Estados Unidos, porque no de otro modo podría disponerse del gravamen posterior constituído a su favor, toda vez que se trata del poder soberano. Debido a la inmunidad de que goza la soberanía, ya se trate de Estados Unidos, un estado o territorio, ha sido imposible en el pasado cancelar gravámenes constituídos a favor del soberano, sin incluirlo como parte demandada, para lo cual era necesario obtener su consentimiento. El acreedor hipotecario podía demandar y obtener sin obstáculos la venta del inmueble hipotecado; pero el gravamen del estado permanecía intacto como antes de iniciarse la acción. *Christian v. Atlantic & N. C. Railroad,* 133 U. S. 243. Para remediar esta dificultad se aprobó la ley que permite a los Estados Unidos ser designado como parte demandada bajo ciertas condiciones. Copiamos a continuación las razones expues-

tas por el Comité Judicial de la Cámara de Representantes de los Estados Unidos para recomendar favorablemente esta medida legislativa:

"Esta legislación ha sido recomendada durante un número de años por la Asociación Americana de Abogados por conducto de su comité de eliminación de gravámenes del gobierno sobre bienes raíces, por la Liga de Construcción Local de los Estados Unidos y la Asociación de Préstamos, y por numerosas compañías de propiedad inmueble, a fin de reparar la injusticia con que se confrontan los acreedores hipotecarios merced al presente estado de la ley, quienes hallan, cuando se hace necesario ejecutar sus hipotecas, que el Gobierno Federal ha anotado contra la propiedad un segundo gravamen por alguna deuda contraída con los Estados Unidos por el dueño de la propiedad y para el pago de la cual el acreedor hipotecario no tiene obligación legal ni moral. Bajo tales circunstancias, el acreedor se ve en un *impasse*. Le es imposible hacer que se venda en pública subasta la finca, a causa de la nube sobre el título creada por el gravamen del gobierno. No puede remover el gravamen, pues no dispone del medio por virtud del cual pueda hacer parte en el procedimiento ejecutivo a los Estados Unidos. Se le frustra, pues, su derecho a ejecutar a menos que esté dispuesto a satisfacer el gravamen del gobierno, deuda de la cual él no es responsable, ya que es una persona a quien el gobierno jamás trataría de cobrar."

Esta legislación fué objeto de prolongadas discusiones en las conferencias celebradas por los comités de ambas cámaras. Estas discusiones culminaron en la aprobación de un "bill" sustituto que fué más tarde convertido en ley sin enmiendas. El comité de la Cámara produjo un informe dando cuenta del acuerdo a que se llegó en el seno de las conferencias. Copiamos lo que dice este informe en relación con el artículo cuarto de la ley, tal y como fué definitivamente aprobado:

"La enmienda del Senado contiene una cláusula permitiendo a la corte suspender los procedimientos de venta hasta la terminación de la próxima sesión del Congreso. Esto sin duda se propuso para permitir al Congreso asignar fondos a fin de que Estados Unidos, en caso de ser dueño de un segundo gravamen, pudiese hacer posturas al verificarse la venta para satisfacer gravámenes anteriores y proteger el

suyo. En su lugar el 'bill' sustituto dispone que Estados Unidos, en caso de poseer un segundo gravamen, tendrá un año para redimir. De este modo no hay necesidad de que la venta se posponga. En muchos Estados de la Unión existen en la actualidad leyes que permiten a los poseedores de segundos gravámenes, así como a los dueños en pleno dominio, un año para redimir, desde la fecha de la ejecución y venta de la propiedad. Es verdad que en otros Estados no existe este derecho de redención. Sin embargo, la disposición nada agrega a las dificultades existentes en aquellos Estados que no conceden período alguno para redimir la propiedad, toda vez que bajo las condiciones actuales cuando las personas a cuyo favor existen gravámenes no pueden demandar a Estados Unidos, los derechos de Estados Unidos nunca son destruídos por el decreto dictado en el procedimiento de ejecución.''

Para mayor claridad y comprensión vamos a permitirnos transcribir las secciones primera, tercera y cuarta de la ley en cuestión:

''Sec. 1ª. Decrétase por el Senado y la Cámara de Representantes de los Estados Unidos, reunidos en Congreso: Que bajo las condiciones aquí prescritas para la protección de los Estados Unidos, por la presente se otorga el consentimiento de los Estados Unidos a que se le haga parte en cualquier pleito que esté pendiente o se instituya en lo sucesivo en cualquier corte de distrito de los Estados Unidos, incluyendo las de los distritos de Alaska, Hawaii y Puerto Rico, y la Corte Suprema del Distrito de Columbia, y en cualquiera corte estadual que tenga jurisdicción sobre la materia, para la ejecución de una hipoteca u otro gravamen sobre un inmueble, a fin de obtener una sentencia que se relacione con cualquier hipoteca u otro gravamen que sobre los bienes puedan tener o alegar los Estados Unidos.

''*       *       *       *       *       *       *

''Sec. 3ª. Un litigio de tal naturaleza incoado contra los Estados Unidos en cualquier corte de Estado podrá ser trasladado por los Estados Unidos a la Corte del Distrito de los Estados Unidos en que esté pendiente el litigio. El traslado se efectuará del modo prescrito por la sección 29 del Código Judicial (título 28, sec. 72, Código de los Estados Unidos): *Disponiéndose,* que la petición de traslado podrá ser radicada en cualquier momento antes de expirar el término de treinta días concedido por esta ley o por la corte a los Estados Unidos para contestar, y no se exigirá fianza alguna para el traslado. La corte para ante la cual se traslade el caso puede, antes de

dictar sentencia, devolverlo a la corte del Estado si se desprendiere que no existe una verdadera contienda respecto a los derechos de los Estados Unidos, o cuando aparezca de los autos que todas las demás partes admiten las reclamaciones de los Estados Unidos.''

"Sec. 4ª.   Excepto en tanto en cuanto aquí se dispusiere lo contrario, una venta judicial efectuada en cumplimiento de una sentencia dictada en tal litigio tendrá el mismo efecto respecto a la exoneración de gravámenes y cargas en favor de Estados Unidos que el dispuesto sobre tales cuestiones por las leyes del Estado, Territorio o Distrito en que estuviere situado el terreno, *disponiéndose* que toda venta efectuada para el pago de un gravamen inferior al de los Estados Unidos se efectuará sujeta al gravamen de los Estados Unidos y sin que afecte a éste, a menos que los Estados Unidos por sus abogados, consienta en que la propiedad sea vendida libre de su hipoteca o carga y en que se divida el producto de acuerdo con los derechos de las partes; y *disponiéndose* además, que cuando se efectúa una venta para satisfacer un gravamen anterior al de los Estados Unidos, los Estados Unidos tendrán un año a partir de la venta para redimir la propiedad.   En cualquier caso en que la suma adeudada a los Estados Unidos estuviere vencida, los Estados Unidos puede solicitar, como un remedio afirmativo, la ejecución de su propio gravamen o hipoteca y en todo caso en que se vendan bienes para satisfacer una primera hipoteca o un primer gravamen perteneciente a los Estados Unidos, los Estados Unidos pueden ofrecer en la venta cualquier suma que no exceda del importe de su reclamación más los gastos de la venta, según ordene el jefe del departamento, negociado u otra agencia gubernamental a cargo de la administración de las leyes con respecto a las cuales surge la reclamación de los Estados Unidos.''

Es innecesario considerar el aspecto legal de esta cuestión en Puerto Rico con anterioridad a la aprobación de esta ley.   Ya hemos visto las razones que expone el Comité Judicial para recomendar esta legislación.   Estados Unidos consiente en ser demandado en cualquiera de sus cortes de distrito, incluyendo Hawaii, Alaska y Puerto Rico.   Este consentimiento para ser demandado en nuestra Isla, así como las disposiciones de la sección 4ª de la ley, expresan claramente, sin dejar lugar a dudas, la voluntad del Congreso de hacer extensiva a Puerto Rico la referida legisla-

ción. Se alega, sin embargo, que Estados Unidos ha consentido en ser demandado únicamente en la Corte de Distrito Federal, con exclusión de las cortes insulares. Aceptar esta interpretación equivale a declarar que esta ley en vigor en Puerto Rico por la autoridad del Congreso, resulta prácticamente inaplicable por disposición del propio Congreso. No se explica que el Congreso extienda a Puerto Rico la mencionada legislación, sin ofrecerle los medios de hacerla efectiva. El Banco Federal no puede demandar al deudor hipotecario Julio Acevedo Bosques en la Corte de Distrito de los Estados Unidos, porque esta corte carece de jurisdicción sobre las partes y sobre la cantidad que se reclama, que no asciende a $3,000. Tiene necesariamente que acudir a una corte insular, cuyos pronunciamientos no alcanzan a Estados Unidos a menos que figure con su consentimiento como parte demandada. La ley mencionada, según el informe del Comité Judicial, se aprobó para corregir una injusticia. No cabe presumir que el Congreso tuviera la intención de aplicar el remedio sin limitaciones en el continente, y con marcadas limitaciones en esta jurisdicción. Si existe algún fundamento que pueda servir de base a una interpretación restringida, confesamos que es éste un fundamento que escapa a nuestra penetración. Nada gana Estados Unidos si se interpreta la ley en sentido restrictivo y se sostiene que no puede ser designado como parte demandada en una corte insular. En cambio, si se resuelve lo contrario y se adopta una interpretación razonable, que facilite la aplicación de la ley y la realización de los fines para los cuales fué creada, Estados Unidos puede resultar beneficiado dadas las condiciones que la ley prescribe para su protección, y al mismo tiempo se obtendrá la ventaja de resolver judicialmente el gravamen constituído a su favor en su carácter de acreedor hipotecario posterior.

Conviene hacer constar que Estados Unidos no tiene necesidad de someterse a las cortes insulares si no es éste su deseo. La ley le concede el derecho de solicitar el traslado

del caso a su propia corte, una vez interpuesta la demanda en la corte local. No hay temor, por lo tanto, de que sus derechos se ventilen en un tribunal que no sea de su agrado. Si el propósito del Congreso es corregir una injusticia, esta injusticia lo mismo puede manifestarse entre nosotros que en el continente. Si la ley rige en Puerto Rico, deben regir también los medios de hacerla efectiva, y a nuestro juicio si se prescinde de las cortes insulares no puede siempre conseguirse su efectividad.

Alega el peticionario que la frase *"state court"* incluye las cortes insulares. Estados Unidos consiente en ser demandado en sus cortes de distrito, incluyendo Alaska, Hawaii, Puerto Rico, la Corte Suprema del Distrito de Columbia y cualquier corte de estado que tenga jurisdicción sobre la materia. Entiende el peticionario que al usar el Congreso la frase *"state court"* con jurisdicción sobre la materia, ha querido referirse a aquellas cortes que no sean cortes federales en las comarcas mencionadas en la sección primera de la ley. No es razonable suponer que hablando el Congreso de las cortes federales, incluyendo la de Puerto Rico, Hawaii y Alaska, y a renglón seguido de las cortes estaduales, con jurisdicción sobre la materia, quisiera referirse únicamente a las cortes de los estados clásicos de la unión americana, excluyendo a las cortes locales de Puerto Rico, Hawaii y Alaska.

La palabra "estado" puede referirse a un estado de la Unión americana dentro de la constitución y a una denominación política debidamente organizada, no necesariamente como estado ni como territorio o distrito bajo el gobierno de los Estados Unidos.

Veamos lo que dice la Corte Suprema federal sobre esta interesante cuestión. De la opinión emitida por dicha corte en el caso de *Talbott* v. *Silver Bow County*, 139 U. S. 440, copiamos lo siguiente:

"En esta sección no se hace una referencia expresa a los Territorios; únicamente se menciona a los Estados. A juzgar por la letra de la ley, el argumento es corto y claro. El permiso del Congreso

es esencial; no se concede permiso a los Territorios; por lo tanto, la contribución territorial no está autorizada y es nula. Cualquiera que pueda ser la letra de la ley, el argumento falla, porque la premisa menor no puede ser sostenida. ¿Es posible que el Congreso haya querido conceder poderes a los estados para imponer contribuciones y mantener este poder alejado de los territorios? Alguna razón plausible debe sugerirse antes de que se le impute al Congreso la intención de conceder a una jurisdicción independiente, como un estado, el poder de imponer contribuciones a una de sus propias dependencias, y al mismo tiempo mantener alejado un poder igual de una organización política como un territorio, que depende completamente del Congreso y está sujeto a su absoluto mandato y control. Ésta no es la lección corriente que la experiencia nos enseña. . .

"Además, aunque la palabra Estado se usa a menudo para distinguirla de Territorio, sin embargo en su sentido público general, y como se usa algunas veces en los estatutos y los procedimientos del gobierno, tiene el significado más amplio de una comunidad política separada que incluye el Distrito de Columbia y los Territorios, así como aquellas comunidades políticas conocidas como Estados de la Unión. Tal uso de la palabra Estado ha sido reconocido en las decisiones de esta corte. Así, en el antiguo caso de Hepburn v. Ellzey, 2 Cranch, 445, 452, el Juez Presidente Marshall observó: 'Se alega por el demandante que el Distrito de Columbia es una sociedad política separada; y que es, por lo tanto, un estado conforme a las definiciones de los escritores sobre ley general. Esto es verdad.' En Metropolitan Railroad v. District of Columbia, 132 U. S. 1, 9, el Juez Bradley, hablando a nombre de la corte, declaró que 'es indudablemente cierto que el Distrito de Columbia es una comunidad política separada en cierto sentido, y que en ese sentido puede ser denominado un Estado.' Y en el caso de Geofrey v. Riggs, 133 U. S. 258,268, se dió una interpretación similar al uso de la palabra Estado, y en una cláusula que parecía llevar en su faz un significado más reducido que el lenguaje usado en la sección 5219, *supra*. La cláusula figuraba en un tratado entre Francia y los Estados Unidos, y decía así: 'En todos los Estados de la Unión, cuyas leyes existentes lo permiten, en tanto en cuanto dichas leyes permanezcan en vigor, los ciudadanos franceses gozarán el derecho de poseer propiedad personal y real con el mismo título y de igual manera que los ciudadanos de los Estados Unidos.' En presencia de este lenguaje, la palabra 'Estado' parecería referirse no a una comunidad política en general, sino a aquellas comunidades particulares que componen los Estados de la Unión; sin embargo se sostuvo que incluía el Distrito de Columbia, en una

opinión en que el Juez Field se expresó así : 'Este artículo no ha sido felizmente redactado. Deja en duda lo que se significó por 'Estados de la Unión.' Ordinariamente se sostendría que estas palabras se aplican a aquellas comunidades políticas que ejercen varios atributos de soberanía y que componen los Estados Unidos, para distinguirlas de las municipalidades organizadas conocidas como Territorios y el Distrito de Columbia. Y sin embargo comunidades separadas, con gobierno local e independiente, son a menudo descritas como Estados, aunque la extensión de su soberanía política esté limitada en sus relaciones con un gobierno superior o con otros países. Halleck Int. Law, c. 3, párrafos 5, 6 y 7. El término es usado en la jurisprudencia general y por los escritores sobre derecho público como significando sociedades políticas organizadas con un gobierno establecido. Dentro de esta definición el Distrito de Columbia, bajo el gobierno de los Estados Unidos, es tan Estado como cualquiera de aquellas comunidades políticas que componen los Estados Unidos.' ''

Parafraseando a la Corte Suprema de los Estados Unidos bien podemos decir, como sugiere el peticionario, ¿es posible que el Congreso haya querido *corregir esta injusticia* en los Estados, manteniendo el remedio alejado de los Territorios? Alguna razón plausible debe sugerirse antes de atribuir tal intención al Congreso. No es ésta la lección ordinaria de la experiencia.

Por muchos esfuerzos que haga la imaginación no es posible encontrar una razón, y menos una razón plausible, que justifique la exclusión de las cortes insulares o territoriales. Estados Unidos consiente en ser demandado en procedimientos pendientes o que en el futuro se establezcan en las Cortes de Distrito de los Estados Unidos, incluyendo el distrito de Puerto Rico, y en cualquier "state court" que tenga jurisdicción sobre la materia. Puerto Rico es una entidad política soberana. Tiene su Gobernador, Legislatura, Poder Judicial, y en general todos los atributos de un organismo político independiente. Ha sido declarado territorio organizado y es un Estado de la Unión Americana en el sentido amplio de la palabra, que es a nuestro juicio el sentido en el cual se usó por el Congreso la palabra "state" al referirse a las cortes de estado con jurisdicción sobre la materia.

Ahora bien, el hecho de que los Estados Unidos consienta en ser demandado no quiere decir que sea obligatorio designarlo como parte en la acción que se establezca para hacer efectivo el crédito hipotecario. Estados Unidos no es una parte necesaria en los procedimientos incoados contra el deudor. El acreedor puede designarlo como parte demandada o prescindir de su intervención. Si opta por demandarlo en unión del deudor, acogiéndose a la ley federal, entonces debe entenderse que el ejecutante elige para el cobro de su crédito el procedimiento ordinario, toda vez que la ley del Congreso concede a Estados Unidos sesenta días para excepcionar, contestar o presentar cualquier otra alegación.

Entendemos que las cortes de distrito deben ajustarse a las disposiciones de la ley aprobada por el Congreso, aceptando como parte demandada a los Estados Unidos cuando el acreedor hipotecario decida acogerse a la ley aprobada por el Congreso.

*Debe anularse la resolución dictada por la Corte de Distrito de Aguadilla en 27 de enero de 1933 y devolverse el caso a dicha corte para procedimientos ulteriores no inconsistentes con los términos de esta opinión.*

Los Jueces Asociados Señores Wolf y Aldrey disintieron.*